**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

Alma A. Anderson

      v.                            Civil No. 07-099-PB

Michael J. Astrue, Commissioner,
Social Security Administration

### REPORT AND RECOMMENDATION

Claimant Alma A. Anderson seeks review of a final decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits.  See 42 U.S.C. § 405(g).  Pending before the court are claimant's Motion for Summary Reversal of the Decision of the Commissioner (document no. 9) and respondent's Motion for an Order Affirming Decision of the Commissioner (document no. 10).  For the reasons that follow, I recommend that the court deny claimant's Motion for Summary Reversal and grant respondent's Motion for an Order Affirming the Decision of the Commissioner.

I.  BACKGROUND[1]

**A.  Procedural Background**

Claimant was 56 years old when an administrative law judge issued the third final decision in this matter, on December 2, 2005, and was 47 years old when her insurance coverage ended, on March 31, 1997 (Tr. at 14–22, 238–46, 375–81).  She filed her first application for benefits on July 23, 1998, alleging disability beginning July 15, 1995 (Tr. at 103–06).  That application was denied on July 16, 1999.  Claimant appealed that decision to this court, which remanded the matter for further proceedings due to inconsistencies between the findings of the administrative law judge ("ALJ") and the testimony of the vocational expert during the first administrative hearing.  See Anderson v. Comm'r, Soc. Sec. Admin., No. 00–cv–553–JD, slip op. (D.N.H. Mar. 19, 2002) (Tr. at 287–96) ("Anderson I").  The Court found that the correct hypothetical question posed to the vocational expert was the one asked by claimant's counsel, not the one relied upon by the ALJ.  The Court, therefore, reversed the ALJ's decision, finding it was premised on a factual error.

---

[1]The facts are taken from the Joint Statement of Material Facts, filed on September 4, 2007 (document no. 11).

2

On remand, a supplemental hearing was held and a second final decision was issued, on April 23, 2003, again denying claimant's application for benefits (Tr. at 235-46).  Claimant appealed that decision to this court, see Anderson v. Comm'r, Soc. Sec. Admin., No. 04-cv-195-SM, but on September 27, 2004, by agreement of the parties, the matter was again remanded back to the Commissioner ("Anderson II").

On this second remand, the Social Security Administration Appeals Council instructed the ALJ to consider the complete record of claimant's mental health impairment and her maximum residual functional capacity, and to obtain additional evidence from a vocational expert in light of these considerations (Tr. at 402-03).  The Appeals Council further instructed the ALJ to provide specific references to the record evidence that supported the assessed limitations, and to clarify the effect of the assessed limitations on claimant's occupational base.  The matter was assigned to a new ALJ, and a de novo hearing was held on November 9, 2005 (Tr. at 430-466).  On December 2, 2005, the ALJ again denied the claim for benefits (Tr. at 372-81).  The Appeals Council denied review of this third decision, rendering it the final decision and subject to this court's review.

**B.  Factual Background**

Claimant has a high school education and has past relevant work experience as a home health aide, a clerical assistant, an insurance clerk and a receptionist.  She alleges that she became disabled on July 15, 1995, due to pain in her arms and wrists. The medical evidence related to her physical limitations shows that she has bilateral upper extremity tendinitis, specifically in her wrists and forearms.

In November 1994, claimant was first diagnosed with carpal tunnel syndrome by her family physician, Dr. Barry L. Stern.  He treated claimant with splints and anti-inflammatory medication and referred her to a neurologist.  A nerve conduction test was performed on December 7, 1994, which revealed no evidence of carpal tunnel syndrome (Tr. at 148).  Claimant then went to an orthopaedic surgeon, Dr. Stanley Markman, on March 13, 1995, who examined claimant and stated that she had wrist and forearm tendinitis due to typing associated with her job, but that the condition was essentially resolved and she no longer suffered from any restrictions (Tr. at 161).  One week later, however, on March 21, Dr. Stern, opined that she suffered from "overuse syndrome of both wrists," and noted that while she could use a

telephone and do filing without limitation, use of keyboards and
writing should be limited (Tr. at 149).

By May 2, 1995, the bilateral tendinitis returned due to
over-exertion.  At that time, claimant was examined by Dr. Daniel
Perri, a physiatrist[2] and the medical director of Farnum
Rehabilitation Center, Cheshire Medical Center, in Keene, New
Hampshire, who determined the condition could be treated with
rest and non-steroid anti-inflammatory drugs (Tr. at 167).  On
June 2, 1995, Dr. Perri noted that claimant had not worked in
seven to eight weeks, and her tendinitis had improved.  He
concluded that claimant could return to her job as a clerical
assistant without restrictions (Tr. at 169-70).  Claimant did
return to work but was laid off on July 14, 1995 (Tr. at 171).

On July 13, 1995, plaintiff was examined by Dr. Stern.  She
reported that her tendinitis caused occasional pain but, overall,
it was "not too bad," and she hardly used her wrist splints.  Dr.
Stern found no evidence of swelling or tenderness, and noted that
upper extremity strength, reflexes, and sensation were all within
normal limits (Tr. at 171).

---

[2]A physiatrist is a medical doctor who specializes in
physical medicine and who administers physical therapy.  See
http://dictionary.reference.com/browse/physiatrist.

In December 1995, claimant began treatment for depression with Dr. Richard Stein.  Dr. Stein prescribed anti-depression medication.  Claimant reported that she struggled to cope with the lingering pain in her arms.  Although she did not have a job at that time, she regularly babysat her granddaughter a couple days a week.

Another orthopedist, Dr. John Chard, examined claimant in July 1996.  Dr. Chard found claimant had developed tendinitis and a muscle disorder in her forearms.  He recommended claimant treat both her depression and tendinitis with an exercise program.  On October 17, 1996, Dr. Stern saw claimant again and noted that she suffered from severe tendinitis in both wrists, which caused considerable general discomfort (Tr. at 152).  Dr. Stern also sought to treat claimant's depression and prescribed medication.  Claimant's attorney requested she see the psychiatrist, Dr. Stein, again; however, claimant discontinued her therapy with him for financial reasons.

On November 20, 1996, claimant was seen by Dr. Robert Serro, who had replaced Dr. Perri at the Farnum Rehabilitation Center.  Dr. Serro found that claimant's wrist pain was in the 5-6 range on a 10 point scale, which worsened when holding things or

typing, but that she had no swelling, asymmetry or abnormality. He also stated that there had been no significant change in her condition over the past several years (Tr. at 173). Claimant reported that she was not using her wrist splints and had stopped taking anti-inflammatory medication. Dr. Serro concluded that claimant continued to suffer from severe bilateral flexor tendinitis and recommended she resume the exercise and medication program she had done previously, which had helped her condition improve.

Dr. Serro also ordered a complete functional capacity evaluation, which was done in January 1997 (Tr. at 174). The evaluation determined that claimant's ability to lift, carry, push, pull, and do fine motor tasks with both hands was limited, but that she was still capable of performing light to medium duty work (Tr. at 176-81). Based on a number of limitations, the evaluator noted that claimant's limitations were due to a breakdown in body mechanics, and he reported she had pain in both arms (Tr. at 181). The evaluator determined that although claimant could not perform her past relevant work, she could perform sedentary work that did not require fine motor tasks (Tr. at 181).

Claimant was referred to a work conditioning program, which lasted two hours per day for four to six weeks.  Plaintiff attended the program, but was let go after four weeks because, rather than alleviate her pain, it caused her pain to increase. She was reevaluated on May 2, 1997, and was found to have improved her functional capacity to "light-medium" exertional work.  The evaluation form also stated, "improving her present capacity to Strong Medium level will provide a wider range of options for return to work plans" (Tr. at 184-87).

On May 27, 1997, Dr. Stern opined that claimant's chronic tendinitis in the wrists made it impossible for her to work "unless she found new employment at light to moderate" (Tr. at 156).  He also noted that despite physical therapy, she still had trouble using her hands with any repetitive motion (Tr. at 156).

On December 5, 1997, Dr. Serro concluded that claimant could perform within the light/medium work capacity, and further noted that "...there would be no restrictions on bending, kneeling, squatting, climbing, walking, sitting, reaching or driving. [Claimant] would have some limitations in fine motor movement, and she could occasionally do fine motor movement.  There should be limitation of repetitive movements to both wrists.  [Claimant]

would have difficulty doing any activities such as typing for more than one hour at a time." (Tr. at 189).

In October 1997, claimant referred herself to another orthopedist, Dr. Gerald DeBonis, for a "second opinion" (Tr. at 202). Dr. DeBonis "agreed with her treating physicians to date that she appears to have an overuse syndrome involving the upper extremities at the level of the forearm and hand," and concluded she had symptoms of carpal tunnel syndrome, flexor tendinitis and, perhaps, myofascial syndrome[3] (Tr. at 203). Dr. DeBonis referred claimant to a neurologist, Dr. Rand Swenson, who examined claimant on December 9, 1997 (Tr. at 199).

Claimant told Dr. Swenson that she had stopped taking medications for her physical limitations, because she had taken Daypro and other non-steroidals, such as Aleve, for almost a year without much benefit. Dr. Swenson performed sensory and nerve conduction tests that showed claimant was within normal limits (Tr. at 200-01). He concluded that claimant suffered from tendinitis and myofascial pain. On March 23, 1998, Dr. DeBonis examined claimant again and concluded she suffered from overuse

---

[3]"Myofascial syndrome" describes generally muscle pain, in particular pain and inflammation in the body's soft tissues. See http://www.webmd.com/search.

9

syndrome of both upper extremities, which was causally related to her work activity.  Dr. DeBonis opined that claimant had a permanent partial (5%) impairment of the upper extremities, resulting in a 9% impairment of her whole person (Tr. at 206-07).

On October 28, 1998, Dr. Charles Meader, a state agency medical consultant, reviewed the medical records and completed a physical residual functional capacity assessment of claimant (Tr. at 208-17).  He also concluded claimant suffered from tendinitis of both wrists and mild carpal tunnel syndrom.  He determined, however, that claimant was capable of working at the light exertional level and could grasp, write and hold objects, but was limited in both fine and gross manipulation skills.  She was to avoid repetitive overhead lifting and reaching.  He explained the reasons supporting his findings in a detailed narrative (Tr. at 214-15).  Dr. Meader's assessment was affirmed by a state agency in December 1998 (Tr. at 292).

The final administrative hearing was held on November 9, 2005.  Claimant testified that she was 56 years old and had not worked for pay since July 15, 1995 (Tr. at 438-39).  She stated she had worked as an insurance processing technician, from 1985 to 1989, and as a receptionist.  After her last position was

10

eliminated in July 1995, she signed up for temporary work but was
not called (Tr. at 440).

Claimant testified that she had been hospitalized twice for
depression, but could not recall the dates she was hospitalized
(Tr. at 442).  She has suffered from abuse, neglect and
depression.  She explained that she had been placed on
medication, probably in 1994 although she was not certain of the
date, but had stopped taking it because the anti-depressants did
not work (Tr. at 440).  She testified that she had tried
vocational rehabilitation assistance, doing filing on a volunteer
basis, but it proved too much for her so she stopped that too.

Claimant noted that in 1995 she was not able to return to
work, after a two month leave of absence.  Although she was told
to do whatever she could and she tried to work, it hurt terribly.
She kept a record of which days it hurt the most.  She was in
pain all the time.  Claimant said she was a loyal person, was
trying to do things and to ignore the injury, and she did the
best she could (Tr. at 449).  Her position, however, was
eliminated (Tr. at 446).  Claimant also testified that she had
been treated for depression in 1997.  She recalled having trouble
interacting with others because she was embarrassed.  This made

11

it difficult for her to deal with the public, as she would feel anxious whether sitting or standing, without any clear correlation to what she was doing (Tr. at 451).

She admitted that when Dr. Serro told her he did not think she would ever type again, and when she received the results of a functional capacity evaluation test, she withdrew into herself. She testified that she backed out of invitations and isolated herself, because she was ashamed and did not want people to know how much she hurt (Tr. at 447-48). Friends just disappeared. Claimant has two children who live approximately an hour away, and she has been able to maintain contact with them.  She also has two grandchildren, ages ten and seven, whom she sees once in a while; however, she has stopped making family meals (Tr. at 448).

At the time of the hearing, claimant had a driver's license and drove a car to a job she had begun in June 2005, that was located five miles from her home.  The job involved answering phones and was provided to her under "Title Five."  She was participating in a program for people over 55 that have low income or no income.  She earned roughly $100 a week, at a wage of $5.25 an hour.  She stated that she sometimes feels blank,

depressed or sad when working, and does not know whether she is being evaluated on the job (Tr. at 444).  She just shows up and is there (Tr. at 453).

On the date of the hearing, claimant was taking Klonopin for anxiety four times a day, as well as Trazadone at night to help her sleep; however, the antidepressants she had been prescribed had not helped her (Tr. at 452).  At that time, she had difficulties with concentration and maintaining a certain pace. She explained that, during the day, she takes breaks to go to the ladies' room to compose herself, and sometimes she cries at her desk (Tr. at 454).  She also suffers from stomach aches.

Tim Sutton, a vocational expert, also testified at the November 9, 2005 hearing.  He described claimant's past relevant work as a clerical assistant, insurance clerk and receptionist as all semi-skilled in nature.  The ALJ asked a hypothetical question, whether claimant could perform any of her past relevant work given her physical limitations, including no overhead repetitive lifting, reduced fine manipulation, and no prolonged positioning of the upper extremities.  The expert noted that, even with these limitations, claimant could perform the job of a receptionist (Tr. at 460-61).  Claimant's attorney then asked the

vocational expert whether limiting typing or writing to five minutes at a time would impact the availability of work as a receptionist.  The vocational expert replied that it would reduce the job base by half, explaining that the erosion of fifty percent of the job base assumed that the receptionist would type for five minutes, rest for five minutes, and again type for five minutes before resting again (Tr. at 463).  When asked further how the job base would be impacted if one had trouble interacting with the public due to affect and sadness, which required a break at least every half hour, the vocational expert acknowledged that the job base would be eliminated if that difficulty were marked or severe (Tr. at 465).

After the hearing, the ALJ followed the five-step sequential evaluation process described in 20 C.F.R. §§ 404.1520(a), and issued a decision on December 2, 2005.  The ALJ found:  (1) the claimant met the necessary disability insured status until March 30, 1997, and has not engaged in any substantial gainful activity, as defined by 20 C.F.R. §404.1574, since the onset of her disability on July 15, 1995; (2) although the claimant has "severe" impairments, including bilateral upper extremity tendinitis and depression, no single impairment or combination of

impairments met or equaled the severity of an impairment described in Appendix 1, subpart P, Regulations No. 4; and (3) the claimant retained the residual functional capacity to perform her past relevant work as a receptionist (Tr. at 376-78). Because the impairments did not prevent her from performing her past relevant work as a receptionist, the ALJ determined that claimant was not disabled from July 15, 1995 through the date she was last insured, March 31, 1997 (Tr. at 379-80).

## II.  Discussion

### A.  Standard of Review

Claimant has a right to judicial review of the decision to deny her Social Security benefits.  See 42 U.S.C. § 405(g) (Supp. 2007).  The court is empowered to affirm, modify, reverse or remand the decision of the Commissioner, based upon the pleadings and transcript of the record.  See id.  The factual findings of the Commissioner shall be conclusive, however, so long as they are supported by "substantial evidence" in the record.  See Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)).  "Substantial evidence" is "'more than a mere scintilla.  It is such relevant evidence as a reasonable mind might accept as adequate to support a

15

conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971)

(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938));

see also Currier v. Sec'y of Health & Human Servs., 612 F.2d 594,

597 (1st Cir. 1980).  The Commissioner is responsible for

resolving issues of credibility and drawing inferences from the

evidence in the record.  See Rodriguez v. Sec'y of Health & Human

Servs., 647 F.2d 218, 222 (1st Cir. 1981) (reviewing court must

defer to the judgment of the Commissioner).  The issue before the

Court is not whether it agrees with the Commissioner's decision,

but whether that decision is supported by substantial evidence.

See id.  Finally, the court must uphold a final decision denying

benefits unless the decision is based on a legal or factual

error.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76

F.3d 15, 16 (1st Cir. 1996) (citing Sullivan v. Hudson, 490 U.S.

877, 885 (1989)).

**B.  Claimant's Arguments**

Claimant makes several arguments in support of her claim

that the Commissioner's denial of benefits should be reversed.

First she contends that, on remand from Anderson I, the ALJ erred

by not following the clear instructions of Judge DiClerico.

Second, she argues the December 2, 2005, final decision is not

supported by substantial evidence.  In support of this
contention, claimant asserts that:  (a) the ALJ erred by not
attributing controlling weight to the opinions of her treating
physicians; (b) the ALJ erroneously concluded her testimony was
not credible, because he focused on medical evidence which failed
to produce an objective basis for debilitating pain; and (c)
finally, the ALJ should have relied, in part, on her testimony
from the 1999 hearing when her memory was fresher.  After
carefully considering claimant's arguments, for the reasons set
forth below, I find that the final decision was correct.

    1.  Judge DiClerico's Remand Order

    Claimant argues that it is legal error for administrative
proceedings to deviate from a remand order, citing Sullivan v.
Hudson, 490 U.S. 877, 886 (1989).  "Deviation from the court's
remand order in the subsequent administrative proceedings is
itself legal error, subject to reversal on further judicial
review."  Id. (citations omitted).  Claimant asserts that Judge
DiClerico's remand order required an award of benefits based on
the then-current record, and that it was error to reopen the
proceedings and reconsider the evidence.

    Judge DiClerico's remand order was based on a finding that

the ALJ had made a factual error in reaching his final decision.
See Anderson I, slip op. at 10 (Tr. at 296) ("remand order").
The Court found that the ALJ had posed a hypothetical question to
the vocational expert that assumed claimant could work longer
than the record evidence demonstrated, and that ignored the
evidence that accurately reflected her residual functional
capacity.  The ALJ erred when he relied on the expert's answer,
because the hypothetical facts were inconsistent with the record.
The decision, therefore, was reversed and the matter was remanded
for further consideration of the actual evidence.  See id., slip
op. at 8-10 (Tr. at 294-96).

On remand before the same ALJ, he again found claimant was
not disabled, following the five-step sequential analysis
process.  On January 27, 2004, that decision was affirmed by the
Appeals Council, which determined that the ALJ had complied with
the remand order by further evaluating claimant's residual
functional capacity and obtaining additional vocational testimony
about which jobs she could perform given her residual functional
capacity (Tr. at 229).  On appeal to this court the second time,
claimant did not assert that the ALJ had neglected to follow the
remand order, but instead challenged the ALJ's failure to

consider her mental health problems.  See Anderson II.  When the
Court remanded this matter back to the Commissioner a second
time, a new ALJ was instructed to evaluate claimant's mental
impairment, to give further consideration to her maximum residual
functional capacity during the entire period at issue, to provide
specific reference to the evidence of record in support of the
assessed limitations, and to obtain evidence from a vocational
expert to clarify the effect of the assessed limitations on
claimant's occupational base.  Those instructions led to the
third final decision claimant now challenges here.

     I find that the remand order did not require the
Commissioner to award claimant benefits, as she asserts now, but
simply required the ALJ to resolve the claim to be consistent
with the findings in the record about her ability to work.  The
remand order specifically stated, "[t]he case is remanded to the
agency for further proceedings, pursuant to sentence four of §
405(g)."  Anderson I, slip op. at 10 (Tr. at 296).  Sentence four
of § 405(g) empowers the reviewing court to, among other things,
reverse the decision of the Commissioner, "with or without
remanding the cause for a rehearing."  42 U.S.C. § 405(g).  Judge
DiClerico deliberately ordered "further proceedings," when he was

not statutorily required to do so.  Had Judge DiClerico wanted to
simply reverse the denial and award benefits, he could have done
so.  See id.  The subsequent proceedings followed the remand
order, to resolve the inconsistencies in the first decision and
determine claimant's eligibility for benefits based on the actual
factual record, rather than on a hypothetical factual premise.

The record demonstrates that the Commissioner properly
followed the remand order.  Because claimant has not shown that
the subsequent proceedings deviated from the remand order, I do
not find any legal error on which to base a reversal of the final
decision now under review.  See Sullivan, 490 U.S. at 885–86.
Claimant's first argument for reversal fails.

2.  Substantial Weight of the Evidence

(a) **Opinions of the Treating Physicians**

Claimant next argues that the ALJ did not give sufficient
weight to the opinions of Drs. Perri, Swenson, Vidal, Baldwin,
Stern and Serro.  She contends that these doctors' opinions
consistently stated that she suffered from some degree of
tendinitis and myofascial pain, which limited her ability to
perform tasks involving prolonged use of her forearms and hands.
Claimant asserts that these opinions are "binding on the fact

finder unless contradicted by substantial evidence," citing 20
C.F.R. § 404.1527(d)(2).  She concludes that because defendant's
own consulting physician found her credible and agreed she
suffered from tendinitis, the opinions are supported, not
contradicted, by substantial evidence, and the ALJ's
determination should be reversed.

A treating physician's opinion is entitled to controlling
weight if it is "well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with
other substantial evidence in [the] case record."  20 C.F.R. §
404.1527(d)(2); see also Sitar v. Schweiker, 671 F.2d 19, 22 (1st
Cir. 1982) (balancing weight given treating physician against the
entire record).  If the treating physician's opinion is not
accorded controlling weight, the ALJ will consider all the
evidence, including the results of consultant examinations, see
20 C.F.R. § 404.1527(c)(2), and will weigh the treating
physician's opinion based on:  (I) the length, nature and extent
of treatment; (ii) how much the opinion is supported by objective
medical findings (e.g. laboratory tests); and (iii) how
consistent the opinion is with the entire record, among other
factors.  See 20 C.F.R. § 404.1527(d)(1-6) (listing factors

affecting weight given to medical evidence).  Opinions of non-treating physicians that are supported by other evidence in the record may constitute substantial evidence.  See Gordils v. Sec' of Health & Human Svcs, 921 F.2d 327, 329 (1st Cir. 1990) (combining the opinions of consulting doctors to find substantial evidence); see also Sitar, 671 F.2d at 22.

Applying these factors to the final decision before me, it is apparent that the ALJ gave substantial weight to claimant's treating physicians, but simply reached the opposite result from what claimant wanted.  As an initial matter, it is undisputed that claimant's insurance coverage ended on March 31, 1997; accordingly, claimant may only rely on medical opinions that address her condition before March 31, 1997, to demonstrate her claimed disability.  See 20 C.F.R. § 404.101 (explaining insured status) & §§ 404.130-404.131 (determining insured status).

Claimant correctly notes that the record contains substantial evidence that claimant has suffered from upper extremity neuromuscular problems and mental health impairments. As early as November 1994, claimant's family physician, Dr. Stern, diagnosed claimant with carpal tunnel syndrome.  Although nerve conduction testing in December 1994 did not support that

22

diagnosis, the tests demonstrated that claimant suffered from tendinitis caused by over-use in her job, which was confirmed by Dr. Markman, an orthopaedic surgeon.  Dr. Perri, the physiatrist at the rehabilitation hospital, stated on April 26, 1995, that claimant could only do sedentary work, which would involve sitting with limited standing, and which restricted lifting to a maximum of ten pounds and occasionally carrying small articles. He also restricted claimant's use of her hands for grasping, keyboarding, writing, telephone or calculator work, and filing to an hour at a time, for a total of five hours a day (Tr. at 190). The diagnosis and restrictions on her work capacity were fairly consistently acknowledged and upheld throughout the record, e.g., Dr. Chard's July 1996 diagnosis, Dr. Stern's confirmation of same in October 1996, and Dr. Serro's January 1997 assessment.  The record also supports the finding that claimant has endured depression, if not other mental health impairments, and sought treatment for those problems from Dr. Stern and Dr. Stein.

These medical findings, however, do not prove that claimant is disabled and cannot work.  Claimant would be considered disabled if she were unable to "engage in any substantial gainful activity by reason of any determinable physical or mental

impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." See Thomas v. Sec'y of Health & Human Servs., 659 F.2d 8, 9 (1st Cir. 1981) (quoting 42 U.S.C. § 416(i)(1)(A) and citing § 423(d)(1)(A)).  The record here contains no evidence that claimant suffers from a physical or mental impairment that can be expected to cause her death or which lasted continuously for more than one year.  To the contrary, the record contains substantial evidence that, despite her health problems, claimant could have returned to work in a light to medium exertional level capacity.

Both Dr. Stern and Dr. Perri concluded that claimant could have returned to work with restricted conditions.  She did return to work in 1995 and stopped, not because of her medical problems, but because the job was eliminated.  The record demonstrates that claimant's condition improved from the vocational rehabilitation program she attended in 1997.  The record also shows that while claimant had been advised to seek counseling, she chose not to pursue it, and that she also stopped using her splints and taking her prescribed medications.  Claimant testified in 2005 that she, in fact, did work, babysitting her grandchildren a few days a

week and working part-time as a receptionist.

The ALJ concluded that claimant had the residual functional capacity to lift 20 pounds occasionally, to lift up to 10 pounds repetitively, and to push/pull up to 80 pounds, but that she needed to avoid repetitive overhead lifting and prolonged positioning of the upper body (Tr. at 379).  This conclusion was based on the January 1997 functional capacity testing performed at the Farnum Rehabilitation Center by Dr. Serro, who believed that claimant could do light to medium work with limitations, and that she needed to have a variety of activities to give her forearms and hands their necessary rest.  The ALJ found Dr. Serro's opinion was consistent with the treating physicians' opinions, as well as with claimant's activity level.  The ALJ also determined that claimant was not further restricted because of her depression.  The ALJ concluded by noting that "[n]o treating source reported any problems with performing activities of daily living, maintaining social functioning or sustaining attention, concentration and pace." (Tr. at 379).

The final decision denying claimant disability benefits was supported by the substantial weight of the evidence.  The record demonstrates that the ALJ considered the treating doctors'

25

medical opinions and reached a conclusion that was not inconsistent with that evidence.  Claimant's argument for reversal on this basis, therefore, is denied.

### (b) Claimant's Credibility

Claimant next argues that the ALJ improperly found her not credible and based that finding on medical evidence that did not objectively demonstrate her pain.  Citing Gray v. Heckler, 760 F.2d 369 (1st Cir. 1985), claimant contends that subjective symptoms can support a claim for disability.

The Commissioner is responsible for resolving issues of credibility, and deference is accorded those determinations unless they are not supported by substantial evidence.  See Rodriguez, 647 F.2d at 222; see also Ortiz v. Sec'y Health & Human Servs., 890 F.2d 520, 523 (1st Cir. 1989) (deferring to the ALJ's assessment of subjective complaints of pain); Brown v. Sec'y of Health & Human Servs., 740 F. Supp. 28, 36 (D. Mass. 1990) (citing Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) for rule that deference must given the ALJ who has heard the testimony and observed the claimant). Here, the ALJ specifically considered "claimant's subjective assertions of disabling symptoms," and found "she cannot be

accepted as fully credible in this regard" (Tr. at 379).  The ALJ

discounted claimant's alleged pain, because it had not required

her to take any pain medication and had not precluded her from

caring for her grandchildren or traveling with her husband.  The

ALJ also found it significant that claimant had opted not to

pursue therapy for her depression.

In Avery v. Sec'y of Health & Human Servs., 797 F.2d 19 (1st

Cir. 1986), several factors were identified as relevant to the

analysis of alleged disabling pain.  See id. at 28.  The court

explained that pain can establish the severity of a medically

determinable physical or mental impairment.  Claimant here seems

to argue that her subjective feeling of pain is greater than the

objective medical findings of her limitations.  In such

circumstances, the ALJ is required to obtain information about:

the nature, location, onset, duration, frequency, radiation and

intensity of any pain; precipitating and aggravating factors;

type, dosage, effectiveness and averse side-effects of any pain

medication; treatment, other than medication, for the pain;

functional restrictions; and descriptions of claimant's daily

activities.  See id. at 29; see also Mandziej v. Chater, 944

F.Supp. 121, 133 (D.N.H. 1996) (considering daily exercise

regimen in assessing disability); 20 C.F.R. §§ §404.1529 and
416.929(c)(3). "In evaluating a claimant's subjective complaints
of pain, the adjudicator must give full consideration to all of
the available evidence, medical and other, that reflects on the
impairment and any attendant limitations of function." <u>Avery</u>,
797 F.2d at 29.

My review of the final decision and the record supporting it
leads to the conclusion that the ALJ followed the <u>Avery</u>
guidelines in evaluating claimant's alleged disabling pain.  The
ALJ specifically cited claimant's decision not to seek therapy
for her depression and her ability to babysit her grandchildren
and travel with her husband as minimizing the alleged severity of
the pain.  In addition, the record demonstrates claimant elected
not to wear her wrist splints, chose to stop taking medications
prescribed to treat both her physical and her mental impairments,
and remains able to drive to work.  This evidence casts further
doubt on the severity of claimant's alleged pain.  I am required
to defer to the credibility determinations and inferences drawn
by the ALJ, as long as they are not inconsistent with the weight
of the evidence.  I do not find any reversible error based on the
ALJ's discounting of claimant's credibility.

### (c) Testimony at the 1999 Hearing

Claimant's final argument is that the ALJ should have relied, at least in part, on her testimony from the 1999 hearing, when her memory was fresher.  It is not clear for what purpose claimant advances this argument[4], but I will assume she makes it to counter the ALJ's finding that claimant was not wholly credible about her disability, i.e., the testimony from 1999 would have made claimant more credible.  Claimant seems to argue that had the ALJ properly understood the remand order, the ALJ would have considered the 1999 hearing testimony.[5]

The ALJ, however, stated that she had carefully reviewed the entire record (Tr. at 379, 380).  I find that the ALJ conducted a comprehensive review of the medical record, including evidence outside of the covered period.  There is no basis to believe that the ALJ did not consider the transcript of the 1999 hearing when she reviewed the record.  The rationale behind the final decision reflects a careful review of the entire record, and a careful

---

[4]Defendant does not even address this argument.

[5]In her brief, claimant cites the ALJ's statements at the November 9, 2005, hearing, that the proceedings had gone beyond the remand order and that she was not bound by it (Tr. at 435), to support her position that the ALJ did not properly base her decision on the record adduced at the 1999 hearing.

assessing of credibility based on that review.  The power to resolve conflicts in the evidence lies with the Commissioner, not with the doctors or the courts.  See Rodriguez, 647 at 222.  In the resolution of such conflicts, I cannot say that the ALJ's decision was not supported by substantial evidence.  I do not find that the ALJ ignored any critical factual or legal issue when issuing the final decision.  If there is a substantial basis in the record for an ALJ's decision, the court must affirm the decision, whether or not another conclusion is possible.  See Ortiz, 955 F.2d at 769.  I cannot conclude that a reversal is warranted based on the ALJ allegedly not considering the claimant's testimony from 1999.

## CONCLUSION

While claimant may very well have experienced depression during the covered period, and certainly suffered from severe bilateral tendinitis which caused her significant pain, the evidence of record supports the conclusion that her mental condition in combination with her physical condition did not manifest themselves in sufficient functional limitations during the covered period to require a finding of disability prior to March 30, 1997.  Looking at the evidence as a whole, I find that

there is no good reason to remand or reverse.  I, therefore,
recommend that claimant's Motion for Summary Reversal of the
Decision of the Commissioner (document no. 9) be denied, and that
respondent's Motion for an Order Affirming Decision of the
Commissioner (document no. 10) be granted.

Any objections to this report and recommendation must be
filed within ten (10) days of receipt of this notice.  Failure to
file objections within the specified time waives the right to
appeal the district court's order.  See Unauthorized Practice of
Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992);
United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_____
James R. Muirhead
United States Magistrate Judge



Date:      February 4, 2008

cc:        Michael C. Shklar, Esq.
           David L. Broderick, Esq.
           United States Social Security Administration